**WELLS et al. v. UNITED STATES.**
**No. H—321.**

Court of Claims.
April 7, 1930.

W. W. Spalding, of Washington, D. C. (Mason, Spalding & McAtee, of Washington, D. C., on the brief), for plaintiffs.

Wm. T. Sabine, Jr., of Washington, D. C., and Herman J. Galloway, Asst. Atty. Gen. (Fred K. Dyar, of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and GRAHAM, GREEN, LITTLETON, and WILLIAMS, Judges.

WILLIAMS, Judge.

This is a suit brought by the executors of the estate of John W. Wells, deceased, to recover the sum of $83,683.62, with interest thereon, which amount, it is alleged, was illegally assessed and collected as federal estate taxes by the Commissioner of Internal Revenue under the Revenue Act of 1918.

The decedent was a resident of the state of Michigan. He was a man of strong character who had by his own efforts and industry accumulated a considerable fortune. When a young man he moved from Iowa to Michigan, where he became interested in the business of acquiring and selling timber lands and manufacturing lumber, in which business he continued up until the time of his death and out of which he accumulated his fortune.

The decedent was the father of five children, three sons and two daughters, who survived him. In 1901 he began to make advancements of money and other property to his children. He kept a set of books in which the transfers of property and money to his children were recorded.

The decedent often expressed the opinion that the proper thing for a man of wealth to do was to give his children substantial sums of money while he was yet living that they might have the experience in handling it while they had a father to counsel with and give advice.

The decedent and the late Senator Stephenson, of Wisconsin, who died about the year 1918, were associated together in the lumber business and were close friends. It seems that Senator Stephenson was not so liberal in the matter of making gifts to his children as was the decedent. Decedent often discussed the policy pursued by Senator Stephenson with his children and expressed the opinion that he was making a great mistake in not giving property to his children while he was living to help them handle it properly and said, "That is not my policy."

Between the time decedent began making advancements to his children in 1901 and the date of his death, August 17, 1921, he had transferred to them in money and property, including interest accrued on such gifts, $1,397,814. Of this amount $782,903 had been transferred within two years prior to his death as follows:

(1) In December, 1919, he transferred and delivered to his sons, Daniel Wells and Artemus C. Wells, 416 shares of the capital stock of the J. W. Wells Lumber Company. By reason of a stock dividend, subsequently declared, these shares were increased to 1,280 shares at the date of decedent's death. Their stipulated value is $103,808.

(2) On January 1, 1921, he transferred and delivered to his children 68,985 shares of the Girard Lumber Company of the agreed value of $344,925.

(3) On January 26, 1921, he placed in trust 3,713 shares of the capital stock of the Lloyd Manufacturing Company to the end that this stock might be exchanged for stock in the Heywood-Wakefield Company and then the Heywood-Wakefield shares received might be delivered to his wife and children. The agreed value of the property transferred as aforesaid is $782,903.

After the death of decedent the plaintiffs as executors of his estate filed with the Bureau of Internal Revenue an estate tax return wherein the shares of stock transferred as aforesaid were not included in the net estate subject to Federal estate taxes. Upon an audit of the return by the bureau, the commissioner determined and held that the shares of stock so transferred, within two years prior to the death of decedent, were transfers in contemplation of death and were subject to the tax. Consequently $782,903, the value of said stocks, was added to the taxable estate, upon which plaintiff paid an additional tax in the amount of $83,683.62, which tax is the basis of this suit.

The taxes in question were assessed under the revenue act of 1918. The relevant part of which provides as follows:

"Sec. 401. That * * * a tax equal to the sum of the following percentages of the value of the net estate (determined as provided in section 403) is hereby imposed upon the transfer of the net estate of every decedent dying after the passage of this Act. * * *

"Sec. 402. That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated. * * *

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title."

The gifts in question were undoubtedly a material part of decedent's property and were in the nature of a final distribution or disposition of such property, without a fair consideration in money or money's worth, and having been made within two years prior to decedent's death, a presumption arises under the statute that such gifts were made in contemplation of death. The presumption created is one of fact, to overcome which the burden of proof is on the plaintiff.

The words "in contemplation of death" have been construed many times in both state and federal courts and have come to have a distinctive meaning. In Spreckels v. State, 30 Cal. App. 363, 158 P. 549, 551, the court said: "A reasonable and just view of the law in question is that it is only where the transfer of property by gift is immediately and directly prompted by the expectation of death that the property so transferred becomes amenable to the burden; or, as counsel for the respondents with singular aptness states the proposition: 'It is only when contemplation of death is the motive without which the conveyance would not be made that

a transfer may be subjected to the tax.' That is, the expectation of death must be the direct, specific, and immediate animating cause of the transfer."

In Schwab v. Doyle, 269 F. 321, 328, the Circuit Court of Appeals said: "On principle, and without present reference to authority, the ultimate question concerns the motive which actuated the grantor; that is to say, whether or not a specific anticipation or expectation of her own death, immediate or near at hand (as distinguished from the general and universal expectation of death some time), was the immediately moving cause of the transfer."

This court, in the case of Meyer v. United States, 60 Ct. Cl. 474, construed the words "contemplation of death" as follows:

"A review of the authorities is scarcely necessary to sustain the proposition that the contemplation of death referred to in the statute is not that contemplation of death which must be present with all of us, mindful of its certainty at some time, we know not when, but it is that state of mind which by reason of advanced age, serious illness, or other producing cause induces the conviction that death in the near future is to be anticipated. If it be said that there need not be a conviction that death is imminent, there must at least be a belief that it is to be expected in the very near future rather than in the usual course of events. And in this state of mind, in this belief in the near approach of death, must be found the motive for the conveyance if it is properly to be characterized as made in contemplation of death.

"The question necessarily involves the determination of a mental state, and that, too, the mental state at a given time of one who, at the time the question is for determination, has passed from life. The difficulties are therefore apparent. In the absence of proof as to express declarations of the decedent—seldom, we may assume, available to the Government—the burden of affirmative proof could but rarely, if ever, be successfully assumed; and wisely, therefore, and perhaps of necessity also, the law has relieved the Government, under the condition stated, of the burden and created the presumption.

"But what is the result? Can it go further than to shift the burden of proof, leaving the presumption to prevail in the Government's favor in the absence of a reasonable showing to the contrary? Taxing statutes, when of doubtful interpretation, are always to be construed in favor of the taxpayer, and the spirit of this rule must be completely ig-

nored if, in determining a question of fact as between the Government and the taxpayer, rigorous rules as to the proof required to overcome the presumption of the law are to be applied. For if the Government was deemed entitled to a presumption in its favor because of the difficulties of proof, it is to be borne in mind that even though a conveyance was in fact not in any degree made in contemplation of death, the personal representatives might and frequently would be beset by many difficulties in proving that negative fact. Circumstances must largely be relied upon, and these should be fairly—indeed, we think liberally—construed in favor of the taxpayer."

In Rea v. Heiner (D. C.) 6 F.(2d) 389, 392, the court said: "There is a common agreement that the words 'contemplation of death' mean not the general knowledge of all men that they must die; that it must be a present apprehension, from some existing bodily or mental condition or impending peril, creating a reasonable fear that death is near at hand; and that, so arising, it must be the direct and animating cause, and the only cause, of the transfer. If this apprehension, so arising, is absent, there is not that contemplation of death intended by the statute, especially when another adequate motive actuating the gift is shown."

The Board of Tax Appeals, in Starck, Executor, 3 B. T. A. 514, construed the meaning of the term "contemplation of death" as follows: "In determining whether a transfer is made in contemplation of death, the Board must look to the expressions of the decedent, to the outward visible acts and circumstances surrounding a transfer of property prior to death. * * * An act may well be performed in contemplation of death at some time in the future and yet not be in contemplation of death within the meaning of that phrase as used in the statute. The intention of Congress in the enactment of section 402 of the Revenue Act of 1918 was to provide for the inclusion in the gross estate of the value of any property concerning which the decedent made a transfer, except for a fair consideration in money or money's worth, in contemplation of death within a reasonable time in the near future, as distinguished from the general expectation of death entertained by everyone."

The board has since in a long line of well-considered decisions, too numerous to cite, reaffirmed the rule announced in Starck, Executor, supra, and has uniformly applied such rule to the facts presented in cases arising before it in determining whether or not transfers in question were made in contemplation of death.

The question to be decided is whether or not the presumption raised by the statute that these transfers were made in contemplation of death has been overcome by proof adduced on behalf of plaintiffs. It is our opinion the presumption is overcome as to each of the three transfers, and that the plaintiffs have succeeded in establishing affirmatively and conclusively that such transfers were not made in contemplation of death within the meaning of the statute. We have no difficulty in reaching this conclusion as to the transfer made in December, 1919, in which decedent delivered to his sons, Daniel Wells and Artemus C. Wells, 1,280 shares of the J. W. Wells Lumber Company, of the value of $103,808. At the time this transfer was made, the decedent, aside from a case of aggravated asthma from which he had suffered at intervals for three or four years prior thereto, was, so far as he knew, in perfect health. He had not consulted a physician prior to that time for any ailment other than for asthma, which, while annoying, was not regarded by him as at all serious.

His son Artemus had for some time been in the active management of the J. W. Wells Lumber Company and the moving cause for the gift of stock to him was a recognition of the efficient service he had rendered the company and the desire of decedent that he might have a substantial financial interest in the company. The transfer was also made in the furtherance of the policy long adopted by decedent in the matter of making gifts and advancements to his children, which motive will be considered further in discussing the two subsequent transfers. That the decedent at the time of the making of this transfer either anticipated or expected his own death in the immediate or not far distant future is negatived by all the facts and circumstances surrounding the making of the transfer, and by the undisputed proof in the record.

The transfer of the shares of stock of the Girard Lumber Company made on January 1, 1921, and the transfer of the shares of stock of the Lloyd Manufacturing Company, January 26, 1921, were made under different conditions than was the transfer of December, 1919, and present a much closer question.

Decedent spent the latter part of the winter and early spring of 1920 at his winter home in California. About the middle of April he had a severe attack of intestinal trouble. In June of that year his physician in California advised him that he was suf-

fering from cancer of the intestines. Shortly thereafter he left California and went to Chicago, where on July 9th he entered the Presbyterian Hospital. He immediately consulted Dr. Ralph Brown, a specialist in bowel diseases. Dr. Brown diagnosed his case and informed the decedent that his ailment was that of ulcerative colitis, and that he did not have cancer. Dr. Brown further informed him that he would get well. He remained in the hospital from July 10th to September 22d, under the care and treatment of Dr. Brown, at which time he was discharged from the hospital in a greatly improved condition. His appearance was normal; he had gained an appreciable amount in weight, and was advised by Dr. Brown that his condition was excellent.

Upon his discharge from the hospital in September he returned to his home in Michigan; assured his son Artemus Wells, who had been in charge of the J. W. Wells Lumber Company during his absence, that he was completely cured of his trouble and that he felt good, but said that "he was going to be careful of what he ate." He resumed his normal business activities, was at the office of the Wells Lumber Company every day; attended to his correspondence, worked on his books, and was apparently in his usual health. He visited with his friends as usual and made one or two business trips outside the state.

On October 30th he wrote his son Ralph, who was then in England, saying: "I am around about the same as usual. Went to Iron Mountain to see Wells Hallenbeck day before yesterday, from there next day to Dunbar and on home. I feel as well as ever, and bowels normal, but doctor says I must diet and take Bismuth medicine awhile and be careful. Gained 6 pounds since I came home."

He returned to the Presbyterian Hospital on November 30th and underwent an operation for his asthmatic trouble. Dr. Brown saw him on November 30th and pronounced him in good general condition except for some recurrence of trouble with asthma. He left the hospital December 9, 1920, and returned to his home in Michigan. Following his return home he spent considerable time working on his books of accounts at the J. W. Wells Lumber Company's office. On December 31st he executed the transfer of 68,985 shares of stock of the Girard Lumber Company to his children. His son Artemus was secretary of this company, and when his father asked him to sign the certificates in that capacity in order to effectuate their transfer he demurred, and said to his father: "We have all we need. I don't think I would do that." To which the decedent replied: "Well, I have got all that I need, too, and I want to be relieved of the responsibility of looking after this property, and I think you children should take it up." Artemus thereupon signed the certificates and the transfer was completed. On this occasion the decedent had in his hand several penciled statements of his accounts with his children. These statements were in his own handwriting and contained summaries of his accounts with each of his children showing debit balances upon which interest had been computed by the decedent for equalization purposes. The total debit balances due from each of the children appearing upon the summary of these statements, after charging them with their respective shares of the Girard Lumber Company stock, were as follows:

Daniel Wells .....................$ 266,530
Artemus C. Wells................ 231,651
Ralph Wells ................... 175,356
Edna Walsh .................... 180,662
Florence Law ................... 207,444
                                _____
                                $1,063,644

On January 26, 1921, the decedent executed certain trust instruments whereby 3,713 shares of the capital stock of the Lloyd Manufacturing Company were assigned in trust, to be exchanged for an equal number of shares in the Heywood-Wakefield Company, which were in turn to be delivered to his wife and children as follows:

Florence Law (daughter), 818 shares; A. C. Wells (son), 576 shares; Daniel Wells (son), 228 shares; Edna Walsh (daughter), 1,086 shares; Ralph W. Wells (son), 750 shares; and Katherine E. Wells (his wife), 255 shares.

In a letter written to his son Ralph, who was still in England, he explained the transfer and distribution of the Lloyd Manufacturing stock as follows: "I am going to divide Lloyd pref. stock and most of G. L. Co. (Girard Lumber Co.) among you children at once so you will have enough to keep you from hunger at least. I own now 5,103 Lloyd stock, $100 per share. Income, $35,721. I am going to even up my gifts to all now."

In the same letter the decedent said: "The doctors pronounce me cured of bowel trouble, but I will always have asthma. I weigh 140 stripped. Enough. We leave for West on 29th. * * * I am mighty busy getting ready for the West, so good-by."

On February 3, 1921, before leaving for California decedent wrote his daughter Edna explaining to her the transfer of the Lloyd stock as follows: "I have been working on my books and evening up all your accounts. Dan, Art, and Ralph have had advances that were more than you and Florence had and I have equalized one with the other by charging each with what they have had and charging them interest on the account to date, and the inclosed sheet shows what each has had, and how I equalized your a/cs by giving stocks to even."

The decedent left his home in Michigan on February 3d or 4th for his winter home in California. He stopped at Chicago on the way and saw Dr. Brown, who described his condition at that time as follows: "He was vigorous and had an excellent color. He was having, and had had for months then, a normal bowel functioning. He was eating everything and, with the exception of the fact that his asthma had at that time not entirely cleared up, he considered himself well, and I told him that he need have no anxiety whatever about his state of health; that I considered him in excellent condition; that he need have no fears of any recurrence of the ulcerated colitis."

After his return to California the decedent apparently enjoyed his usual health, with the exception of the asthma, until late in the spring. During this time he entertained his friends at his home, took them for automobile rides in the city of Los Angeles and over the mountain roads near by. His friends who had not seen him for some time saw no difference in his appearance. He seemed to them just as spry as he had ever been. About the middle of April, 1921, he had a recurrence of the ulcerative colitis, which not yielding to treatment, led decedent to return to Chicago and re-enter the Presbyterian Hospital on June 5, 1921, where he underwent an operation on August 10th, and died on August 17th.

Applying these facts to the rule that the term "contemplation of death" does not mean that general knowledge of all men that they must die, but that there must be a present apprehension, from some existing bodily or mental condition or impending peril, creating a reasonable fear that death is near at hand, and that such reasonable fear or apprehension must be the direct or animating cause, and the only cause of the transfer, it seems quite clear to us that the transfers in question were not made in contemplation of death.

The plaintiffs have not only overcome the presumption created by the statute that the transfers were made in contemplation of death, but have definitely established the fact that the immediate and moving cause of the transfers was the carrying out of a policy long followed by decedent in dealing with his children of making liberal gifts to them during his lifetime. He had consistently followed that policy for nearly thirty years, and the three transfers in question were a continuation and final consummation of such policy. In the last transfer such amounts were given to his children as would even them up one with another, in the gifts and advancements made to them.

That this was the motive which actuated the decedent in making these transfers seems unquestioned. He repeatedly, in letters to his children and in statements to business associates at about the time the transfers were made, gave this as his reason for such transfers.

After the final transfer in which the advancements and gifts to the children were evened up in January, 1921, the decedent still possessed property of the value of nearly $900,000, from which he drew an annual income of approximately $50,000. At the time the transfers were made, decedent had no reason to believe otherwise than, aside from his asthma, he was, for a man of his age, in ordinary health. While he had gone through a most serious and painful illness, he had, as he believed, made an almost complete recovery. He was assured of this fact by his physician, an eminent specialist, in whom he had great confidence. The repeated statements made by him to close friends and associates, his daily activities in matters connected with his business affairs, his letters to his children assuring them of his renewed health, show that he fully believed the assurances given him by his physician that he was cured and had nothing to fear on account of his former illness.

The presumption created by the statute that the transfers in question were made in contemplation of death cannot stand against ascertained and proven facts showing the contrary to be true. The best evidence of the state of the decedent's health at the time the transfers were made is the statement of his doctor. The best evidence of the decedent's state of mind at that time and the reasons actuating him in making the transfers are the statements and expressions of the decedent himself, supported as such statements are by all the circumstances concerning the transfers. Decedent's physician says that at

1012

the time the transfers were made he was in normal health for a man of his age. The decedent in letters to his children and in statements to his friends repeatedly assured them he had recovered from his former illness and was again enjoying reasonable health. He also gave satisfactory reasons for making the transfers in question, which reasons are entirely consistent with all the other facts and circumstances surrounding the transactions and with the policy followed by him for many years in dealing with his children.

It is urged on behalf of the defendant that the fact decedent during the time he was in the hospital, between July 10, 1920, and September 22, 1920, made and entered into a property agreement with his wife as to her share of his property, and made and executed at the same time a will in which the terms of the agreement made with his wife were carried out, and in which also provisions were made for his children, is a strong circumstance supporting the presumption that the two transfers of property made by him later were made in contemplation of death. While these transactions are entitled to consideration in connection with all the other facts and circumstances shown, we do not regard them as having a great deal of weight in determining the question as to the decedent's state of mind, and the motives actuating him in making transfers of property, four months later. No transfers of property were made to the children at the time of the execution of the property agreement with his wife, and the provisions made for their benefit in the will executed at that time were identical with the provisions of a former will. Whatever apprehensions the decedent entertained at the time of the making of the property agreement with his wife as to the chances of recovery from the illness from which he was suffering at that time, had ceased to exist before the transfer of the Girard Lumber Company stock on January 1, 1921, and the Lloyd Manufacturing Company stock on January 26, 1921.

We are of the opinion the three transfers in question were not made by the decedent in contemplation of death, and that the plaintiffs are entitled to recover the sum of $83,-683.62, with interest thereon as provided by law from May 28, 1924, the date on which the taxes were paid. It is so ordered.

BOOTH, Chief Justice, and GREEN and GRAHAM, Judges, concur.

LITTLETON, Judge, took no part in the decision of this case.