## MYERS v. UNITED STATES.
### M—254.

Court of Claims.
April 10, 1933.

Newton D. Baker, of Cleveland, Ohio (T. G. Thompson, of Cleveland, Ohio, Thaddeus G. Benton, of Washington, D. C., John L. McMaster, of New York City, and Howard F. Burns, of Cleveland, Ohio, on the brief), for plaintiff.

Charles B. Rugg, Asst. Atty. Gen. (Joseph H. Sheppard, of Washington, D. C., on the brief), for the United States.

Before GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

WILLIAMS, Judge.

The plaintiff, as administrator of F. E. Myers, deceased, seeks to recover $726,284.-13, with interest, federal estate taxes imposed and collected by the Commissioner of Internal Revenue under the provisions of sections 401 and 402 (c) of the Revenue Act of 1921 (42 Stat. 227, 277, 278).

F. E. Myers, a resident of Ashland, Ohio, died intestate, December 2, 1923. The plaintiff, as administrator of his estate, duly filed an estate tax return disclosing a gross estate of $5,995,487.14, and a tax liability of $802,-150.70, which amount was paid. The return disclosed four gifts made by the decedent to his natural heirs within two years of his death, but the value of the gifts was not included in the gross estate.

Subsequently the Commissioner of Internal Revenue included the four gifts in the gross estate but upon the consideration of a protest filed by the plaintiff, determined to include only the value of the last two gifts. These gifts were made on May 14, 1923, and August 24, 1923, and had respective values of $350,000 and $3,019,159.30. The inclusion of these two gifts in the decedent's gross estate resulted in a deficiency assessment of $726,284.13, which was paid by plaintiff on June 21, 1927. Timely claim for refund of the tax having been filed by the plaintiff, and rejected by the Commissioner of Internal Revenue, plaintiff has instituted this suit to recover the amount so paid.

The challenged tax was imposed and collected under section 401, and section 402 (c) of the Revenue Act of 1921. Section 402 (c) reads:

"Sec. 402. That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated— * * *

"(c) to the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title."

The two gifts in question amounted to $3,369,159.30, slightly less than one-third of the gross estate of $10,627,287.70, as determined by the Commissioner of Internal Revenue. The transfers constituted a material part of the decedent's estate. They were not made as a result of a bona fide sale for a fair consideration in money or money's worth. They were made within two years prior to the decedent's death, and unless the contrary is shown must be deemed to have been made in contemplation of death, and are subject to the federal estate tax imposed by sections 401 and 402 (c) of the Revenue Act of 1921. This presumption is a rebuttable one—expressly stated to be such by the statute—and may be overcome by proof that the transfers were motivated from purposes associated with life rather than with death. United States v. Wells, 283 U. S. 102, 51 S. Ct. 446, 451, 75 L. Ed. 867, affirming Wells v. United States, 69 Ct. Cl. 485.

The Supreme Court, in United States v. Wells, supra, for the first time interpreted the phrase "in contemplation of death" as used in the federal taxing statutes. The court in that case was construing the Revenue

Act of 1918 (40 Stat. 1097) which is identical with section 402 (c) of the Revenue Act of 1921. The decision in that case is a comprehensive and discriminating discussion of the intent and meaning of the term "in contemplation of death" and establishes the tests which must control in the determination of whether particular transfers are made in contemplation of death. The court said:

"* * * Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. Nichols v. Coolidge, 274 U. S. 531, 542, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A. L. R. 1081; Milliken v. United States, 283 U. S. 15, 51 S. Ct. 324, 75 L. Ed. 809. As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. * * * The question, necessarily, is as to the state of mind of the donor.

"As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand.'

"If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. Such transfers were made the subject of a distinct gift tax, since repealed. * * * The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is not only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death."

Following the language just quoted the court, referring to the views expressed by this court in its decision, said: "We think that the Government is right in its criticism of the narrowness of the rule laid down by the Court of Claims, in requiring that there be a condition 'creating a reasonable fear that death is near at hand,' and that 'such reasonable fear or apprehension' must be 'the only cause of the transfer.' It is sufficient if contemplation of death be the inducing cause of the transfer whether or not death is believed to be near. But it does not appear that the decision of the court rests upon the limitation thus expressed. The court did not rely merely upon the fact that at the time of the transfers decedent considered that he had recovered from his former illness and believed the assurances given him by his physician that he need have no fear of its recurrence or any 'anxiety whatever about his state of health.' That fact was manifestly important, but, in addition to that, the court held that 'immediate and moving cause of the transfers was the carrying out of a policy, long followed by decedent in dealing with his children of making liberal gifts to them during his lifetime.'"

It is the contention of the plaintiff that the facts in the instant case make a far stronger showing than the facts in the Wells Case that the gifts in question were not made in contemplation of death. It is urged that the impelling motive for the gifts was to gratify a living purpose and was the final consummation of plans which were made by the decedent at least as early as 1917. Plaintiff says in his brief: "* * * the impelling and dominant motive for the gifts of May 14th and August 24, 1923, was his gratification over the attainment of a purpose

which was so desirable to him during his life-time and the completion of plans for the welfare of their children which he and Mrs. Myers had long delighted to consider together. This purpose was the broader development and training and the increased happiness of his children during his lifetime in preparation for the responsibilities of large wealth which they would later have to assume. Such motives were entirely unaffected by any thought of his own death at any time."

■ The Supreme Court in the Wells Case pointed out that in accordance with proper practice this court should have found the ultimate fact as to the impelling motive for the transfers. Appreciating fully the grave responsibility this duty imposes upon the court, we have given a most careful consideration to all the facts and circumstances shown to detect and determine the dominant motive of the decedent in making the transfers. We have reached the conclusion that the facts and circumstances disclosed, considered in the light of the bodily and mental condition of the decedent at the time the transfers were made, fail to overcome the presumption raised by the statute, and have accordingly found that the transfers in question were made in contemplation of death.

The decedent was 74 years 8 months and 16 days old at the time of his death on December 2, 1923. He was in every respect and in the best sense of the term, what is commonly known as a self-made man. Born and reared on a farm, where he lived until he reached the age of 20 years, with only a common-school education, and without the aid of inherited wealth, through his own untiring efforts and ability, he became one of the great industrial leaders of his day and at his death left a fortune of more than $10,000,000. The record discloses that he was a man of determined will, dominating personality, and possessed of almost infinite capacity for hard work. He was exceptionally energetic and active, both physically and mentally, and until a short time before his death kept in close touch with every detail of his large and varied business enterprises. He believed in economy and thrift both in the use of time and money. He practiced these virtues in his own life and incessantly urged their importance upon his children. Although a man of great wealth, he lived frugally and simply and indulged in no luxuries. He was not a liberal or generous man in the expenditure of money, either in his dealings with his family or others, when his great wealth is taken into consideration. Liberality is a relative term. A do-nation or gift that would be considered as most liberal and generous when made by one of limited wealth or means might well be deemed niggardly if made by one of ample means or great wealth.

While witnesses testified generally that he was most liberal in his dealings with the public and made large and generous contributions to churches, educational and other institutions, cross-examination of these witnesses developed that the sum total of such contributions during the twenty-year period preceding his death was very small—$15,000 toward the building of a Y.M.C.A. in Ashland, Ohio, $25,000 for the reconstruction of an old hall at Wittenberg College, Springfield, Ohio, which was later called "Myers Hall," $10,000 for a nurses home which he and his wife presented to a local hospital, a $5,000 donation to a college at Ashland, and a gift of $5,000, between 1912 and 1915, toward the rebuilding of a church at Ashland. Aside from these outright donations the decedent contributed annually from $800 to $1,000 to the English Lutheran Church at Ashland. If he made other and further gifts than those stated, they are not shown in the record.

An incident in connection with decedent's donation of $5,000 to the college at Ashland, which was made in 1923, only a few months before his death, throws significant light on his mental attitude toward giving. Shortly after signing his subscription for the $5,000 the college found itself in need of immediate funds. Decedent was informed of that fact and requested to pay his subscription, with the statement that if he would do so five percent would be deducted from the amount of the subscription. He accepted the proposition, wrote his check for $4,750, and thus liquidated his voluntary obligation to contribute $5,000 to a college in his home town where he had lived for 50 years and where he had amassed his great fortune.

Until after he had passed the age of 72 years decedent was no more liberal in dealing with members of his family than he was in his public benefactions. His family consisted of his wife and four children, two sons and two daughters. The oldest son, George, died in 1915 at the age of 40 years, unmarried. The only gift made by decedent to this son was 60 shares of stock of a par value of $100 each, $6,000, which was made in 1907. At the same time he made a like gift to his younger son John. He gave each of the three children at the time of their marriage $15,000 in cash for the purpose of buying a

home. He later gave John $7,000 additional for the completion of his home. In 1918 he gave to each of his children $25,000 in Liberty bonds. Aside from small sums ranging from $100 to $500 which he gave the children from time to time while living at home before their marriage, and presents such as automobiles and pianos, made to them subsequent to their marriage, the sum total of decedent's gifts to his children prior to December 1921, was $6,000 to his son George, $53,000 to his son John, and $40,000 to each of his two daughters.

These facts are strikingly dissimilar to the facts in the Wells Case. Wells for 30 years prior to the time the gifts in question in that case were made had followed a consistent policy of making large gifts to his children. It was a part of his philosophy of life that the wise and proper thing for a rich man to do was to make large and generous advancements to his children while they were young and could have a father's advice in its control and management. It was his desire to see his children established in life and trained in the management of property while he was alive and could assist them. He preached this wholesome doctrine to his business associates year in and year out and consistently followed it in dealing with his children. Not only that, he was severe in his criticism of some of his rich associates who followed a different policy in dealing with their children—a policy characterized by him as "niggardly." His final gifts, the subject of the litigation, were a balancing of the books, an equalization among his children of their gifts, and was stated by him to be such, and was so marked on his books. He had also been told by his physician, an eminent specialist in whom he had great confidence, a short time before the gifts were made, that he was fully restored from a previous illness; that he was in good health for a man of his age, and had no reason to fear a recurrence of his ailment. Upon that record, and the facts as stated were supported by overwhelming proof, both oral and documentary, it was held that: "The plaintiffs have not only overcome the presumption created by the statute that the transfers were made in contemplation of death, but have definitely established the fact that the immediate and moving cause of the transfers was the carrying out of a policy long followed by decedent in dealing with his children of making liberal gifts to them during his lifetime. He had consistently followed that policy for nearly thirty years, and the three transfers in question

were a continuation and final consummation of such policy. * * *"

Here a different picture is presented. We have a man, many times a millionaire, with a princely income ranging as high as $700,000 a year, whose only gifts to his children until after he had passed the age of 72 years, aside from small wedding gifts and occasional presents such as automobiles, pianos, jewelry, etc., were $25,000 in Liberty bonds given to each of them in 1918; a man who, though amply able to establish his children comfortably and independently in life, without serious impairment of his great and rapidly mounting fortune, did not see fit to do so, but chose rather to leave them practically to their own resources until they had reached middle life; and who permitted a son to support a wife and three children on the meager salary of $5,000 a year until he was past 39 years of age. The mere recitation of these facts shows how unlike they are to the facts in the Wells Case, and utterly refutes the suggestion that the decedent consistently practiced a policy of making large and generous gifts to his children.

The decedent, however, during the last two years of his life adopted a more liberal and generous policy and transferred to his children by four separate gifts property aggregating more than $5,000,000 in value.

It is contended by plaintiff that the impelling motive for these gifts was the carrying out of "living purpose" plans formulated by the decedent not later than 1917—the giving of property to his children in his lifetime—and that the gifts of May 14, 1923, and August 24, 1923, the gifts involved in suit, were the accomplishment and final consummation of these plans.

Decedent in the year 1917 was considering the matter of making a gift of some of his property to the children and discussed the matter with certain of his business associates. Just when he definitely concluded that he would make the gift is not disclosed. He was still considering the matter in 1919 and so informed his son John. However that may be, the proof, in our opinion, leaves no room for doubt that whatever plans he may have formulated in 1917, or had in mind at that time in reference to making a gift of property to his children, were completely and precisely executed and consummated in the trust agreement of December 22, 1921.

In 1917 the decedent informed Mr. H. D. Messick, a close friend and business associate, that he intended to give his children some

property of substantial value, and discussed with him the advisability of placing it in trust. He informed Messick that the reason he wanted to give some of his property to his children in his lifetime was that he had more than sufficient and that he wished them to have the use and enjoyment of it. In 1919 he discussed these plans with Mr. J. R. Nutt, of Cleveland, and in 1919 he informed his son, John, that he was considering with Mr. Messick creating a trust in favor of his children. Mr. Nutt suggested that he make his gift to the children outright. This suggestion was rejected, the decedent stating that he wanted the gift to be in the form of a trust where the bank could look after the securities and the children to have the income for awhile.

In 1920 Mr. Messick was requested to prepare the trust agreement, which he did, but the trust for certain business reasons was not then executed. Subsequently in 1921 decedent again had Mr. Messick prepare a trust agreement which was executed on December 22, 1921, depositing in trust for his wife and three children stocks and bonds of the approximate value of $1,200,000. The income from the trust was payable equally to the beneficiaries for three years, at the end of which time three-fourths of the corpus was payable to the children in equal shares, and the remaining one-fourth was similarly payable to them upon the death of their mother. There is no evidence that the decedent, either in 1917 or at any time prior to the execution of the trust agreement of December 22, 1921, ever planned or contemplated gifts of property to his children other than the gifts embodied in this agreement. All plans formulated by him before that date for making gifts to his children were fully consummated by the execution of this trust agreement. There is no evidence that he then had in mind or had formulated plans for other and further gifts. This fact is conclusively shown by the decedent's statement to his children on Christmas, 1921, at the time he presented them the trust agreement, that in making the gift he and his wife had succeeded in doing something they had expected to do and had been planning to do for some time. He had succeeded in doing what he had planned to do, and all that he had planned to do—created a trust in favor of his children.

The decedent was past 74 years of age at the time the gifts of May 14, 1923, and August 24, 1923, were made. They were made within a few months of the date of his death, and at a time he was suffering from an in-

curable malady. It is true he had not been informed of the nature of his ailment by either the physicians attending him or by his children. It is true, also, that up to a short time preceding his death he retained his mental alertness, visited his office frequently, dictated letters, examined reports, signed documents, held conferences with his associates, and kept in close touch with his business affairs. He continued to make occasional automobile trips, attended meetings of boards of directors of corporations in which he was interested, and addressed banquets on two or three occasions at about or subsequent to the time the gifts were made. Aside from the fact that he was losing weight there was very little change in his personal appearance prior to August 24, 1923.

It is contended that these facts and circumstances conclusively show that the decedent had no knowledge of his actual condition at the time the gifts were made; that he felt no apprehension that his illness would result fatally; and that his bodily and mental condition in no way influenced him in making the gifts.

 While some of the facts and circumstances shown are consistent with the theory that some motive other than contemplation of death impelled the decedent to make the gifts, they are far from conclusive. A consciousness that death is imminent is not required to bring the gifts within the statute. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is sufficient if contemplation of death be the inducing cause of the transfer whether or not death is believed to be near. United States v. Wells, supra. We think the facts and circumstances relied upon, taken as a whole, tend to support rather than to rebut the presumption that the gifts were made in contemplation of death. The decedent could not be unaware of the fact that he was suffering from a most serious ailment that would probably prove fatal. He had visited the Cleveland clinic as early as August 1921. For six months prior to that time he had suffered from indigestion and sharp pains in the stomach. He had lost 12 pounds in weight. He was then found to have high blood pressure and was admonished to slow up in his work and to go on an ordered diet. He was also warned by the physician that if he did not follow these instructions serious results would follow. He disregarded these warnings and continued to work as hard as before. Between that date

and January 1, 1923, he had been attended by his physician, Dr. Patton, on 22 occasions.

While in Florida in January 1923, he suffered intense pains in the region of his right side and abdomen. His suffering was so acute that Mrs. Myers had him promise that upon their return home he would go to the Cleveland clinic for an examination. Shortly after his arrival home on March 16, he told Dr. Patton that he was troubled with a disturbance in his right side which he believed to be his appendix. Dr. Patton examined him and concluded that the trouble was cancer. He did not inform decedent of what he suspected but advised him to go to the clinic for examination. On March 26, he was examined at the Cleveland clinic and his ailment was definitely ascertained to be a cancerous growth at the junction of the large and small intestines. X-ray pictures confirmed this diagnosis and disclosed the presence of a cancerous growth of the size of a "small grapefruit." It was estimated that this growth had then continued over a period of one or possibly two years, and had become so extended that an operation to remove it was not advisable.

Decedent during the course of the examination referred to the recent death at the clinic of one of his close friends from an appendicitis operation, and expressed the opinion that his trouble might probably be due to the same cause. He was informed by the physicians that this was not true, and was told that his case was not an operable one, but would be treated by X-ray therapy. He received his first X-ray treatment on the following day, March 27, and thereafter was subjected to similar treatments on April 6 and July 1, 1923.

He was not informed by his physicians at that time that he was suffering from cancer. He did not, so far as the record shows, ever inquire of his physicians as to the nature of his illness, or discuss the matter with any one, at any time prior to November 8, 1923. It is most astonishing that the decedent made no inquiries of his physicians at the time of his examination on March 26, or at any time thereafter as to the nature of his illness. He went to the clinic accompanied by his personal physician and his son, believing that he probably might have to undergo an operation for appendicitis, an operation from which one of his close friends had recently died. That he then realized that his condition was serious is not open to doubt. It is incredible that a man of his courage, good sense, and dominating will, when informed by his physi-cians that his ailment was not what he had suspected it might be, would not want to know the exact nature of his trouble and would not demand full information of the result of the examination. In view of the fact that he made no such inquiries the conclusion is well nigh irresistible that he understood and fully realized the seriousness of his condition, and although he may not have definitely known that he had an internal cancer, he suspected the truth, or in any event he knew that he was suffering from a malady that would probably result fatally to him. He knew that he had a lump in his side as big as a small grapefruit; that it was very sensitive, and at times caused him excruciating pain; that it could not be treated by an operation, and that the X-ray treatment to which he was subjected was a well-known and universally recognized treatment for cancer. While, as plaintiff contends, X-ray therapy treatments are used for a number of ailments other than cancer, one of its principal uses is for treatment of cancer, and its use in this case was highly suggestive to decedent, a man of superior intelligence, of the likelihood of the presence of cancer. But without regard to whether the decedent knew or did not know, suspected or did not suspect, the exact nature of his ailment prior to November 8, 1923, he undoubtedly appreciated the seriousness of his condition and realized that his hold on life was most precarious. Unlike the donor in the Wells Case, the decedent was not told by his physicians before the gifts were made that he had recovered his health and was completely cured of his ailment, nor had he been assured by them that he would recover. He knew when the gifts were made that he had not recovered from his illness and that his health had not been restored. While he had received temporary benefit from the X-ray treatments, he still had what he termed "the lump" in his side from which he suffered acutely when in an uncomfortable position, whether walking, riding, or lying in bed. He was losing weight, slowly perhaps, but surely and progressively. His strength and powers of endurance were waning. These striking facts, together with the obvious solicitude of his children, his nurse, and his friends for his health and comfort, the frequent visits of his physician, Dr. Patton, the character of treatments received at the clinic, could hardly have deceived a man of decedent's judgment and insight.

Aside from this most serious and alarming bodily condition, decedent, at and prior to the time the gifts were made, was greatly distressed in mind because of the recent death

of his wife. They had been inseparable companions for a half century, and her death was a great shock to him. The witnesses all testified that he never recovered from the blow, and that he continued to grieve for her until his death.

It was under these circumstances and conditions that the gifts involved were made. It cannot be said that the decedent's bodily and mental condition at the time the transfers were made was such as to negative or refute the presumption created by the statute that they were made in contemplation of death. The burden of proof is upon the plaintiff. He must show either the negative fact that the transfers were not made in contemplation of death, or show affirmatively that they were made because of some impelling motive consistent with the purpose and thought of life, and thus by exclusion establish the fact that they were not made in contemplation of death.

The impelling motive for the gifts, as we have seen, was not and could not have been the carrying out of a policy long and consistently followed by the decedent of making large advancements to his children in his lifetime, because he had never adopted or followed such policy at any time prior to December 1921, when he had passed the age of 72 years, nor was the impelling motive for the gifts the carrying out and final consummation of plans formulated as far back as 1917 for making gifts of property to his children, as the trust agreement of December 22, 1921, completely satisfied and consummated those plans. The impelling motive could not have been that natural and laudable desire of a parent to recognize the special needs of his children, as decedent had, in two prior gifts aggregating more than $2,000,000, established them comfortably in life, and they stood in no special need of his bounty at the time the gifts were made.

The gifts were made to his three children, share and share alike, in the same proportions and interests in which they had natural claims upon his bounty. The distribution among the children was in no way different than it would have been in the event of his death intestate. In the absence of a showing to the contrary, the presumption created by the statute must stand, and the impelling motive for the transfers must be deemed to have been the desire of the decedent, in contemplation of his own death, to transfer to his children a material part of his property in the nature of a final disposition and distribution of the same.

The petition is therefore dismissed. It is so ordered.

BOOTH, Chief Justice, took no part in the decision of this case on account of illness.