**REAL ESTATE LAND TITLE & TRUST CO. et al. v. McCAUGHN.\***

No. 5558.

Circuit Court of Appeals, Third Circuit.

Sept. 11, 1935.

J. Warren Brock, John F. E. Hippel, Franklin S. Edmonds, and Edmonds, Obermayer & Rebmann, all of Philadelphia, Pa., for appellants.

Charles D. McAvoy, U. S. Atty., and Thomas J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Maurice J. Mahoney, Sp. Assts. to Atty. Gen., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge.

The decisions of this court [1] have uniformly held the creation of deeds of trust tax free where sound health and purposes associated with creator's life, rather than with death, led to their creation. Such cases depend on their individual facts. In United States v. Wells, 283 U. S. 102, at page 119, 51 S. Ct. 446, 452, 75 L. Ed. 867, the Supreme Court said:

"It is apparent that there can be no precise delimitation of the transactions embraced within the conception of transfers in 'contemplation of death,' as there can be none in relation to fraud, undue influence, due process of law, or other familiar legal concepts which are applicable to many varying circumstances. There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute."

In affirming the court below [39 F.(2d) 998, 69 Ct. Cl. 485] in that case—which was a much weaker case for the taxpayer than the present one—the Supreme Court, as we view it, stated the decisive question in such cases, namely, "the question, necessarily, is as to the state of mind of the donor," and then cited certain constraining things which might properly influence and evidence the mind of the donor, saying:

"The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is not only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. * * * The gratification of such de-

[1] Rea v. Heiner (D. C.) 6 F.(2d) 389; Lippincott v. Commissioner (C. C. A.) 72 F.(2d) 78S; Heiner v. Donnan (C. C. A.) 61 F.(2d) 113; Commissioner v. Nevin (C. C. A.) 47 F.(2d) 478 (certiorari denied Burnet v. Nevin, 283 U. S. 835, 51 S. Ct. 485, 75 L. Ed. 1447).

\*Writ of certiorari granted 56 S. Ct. —, 80 L. Ed. —.

sires may be a more compelling motive than any thought of death."

Referring to the finding of the court below that the transfer to the donor's children there involved was "a continuation and final consummation of such policy," the Supreme Court said "that this was the motive which actuated the decedent in making these transfers seems unquestioned," and, we may now add, affirmed the contention of the taxpayer.

Turning then to the case before us, we note that no question of the donor executing the trust in contemplation of death is here involved. The trial judge found: "* * * This evidence * * * establishes that the transfer was not made under any consciousness or belief or apprehension that death was imminent. In order that the plaintiffs may have the full benefit of this testimony, I specifically find that such was the fact."

Such being the case, the instrument being made by the donor in contemplation of life, not in contemplation of death, "the question" before us, as quoted above from the Wells Case, "is as to the state of mind of the donor."

The proof is that Dr. Malcolm MacFarlan was a firm-minded Scot, and that with the persistent pertinacity of an opinionated Scotchman, he had methodically husbanded the large gains arising from his profession—he was a leading physician of Philadelphia—until they amounted to nearly three quarters of a million. His life was devoted to acquisition, and coupled with his earning a fortune, was a firm determination on his part to place that fortune in trust for his children. His life was dominated by these two adhered-to lines of conduct. His acquisitions from the fifty-seven years of the practice of medicine and the interest and accretions therefrom amounted to between six and seven hundred thousand dollars. As to the disposition of his fortune, his plan and its fulfillment were in one undeviating path, namely, the creation of irrevocable trusts in favor of his children. His belief in trusts was basic, or, as testified to by his son, "To boil the whole matter down, his motive was to conserve his estate. * * * We did it in 1913. He wanted to do it with my maternal grandfather's estate, he wanted to do it with that." His experience with that estate is strikingly illustrative of the earnestness and sincerity of his dominating motive of trust.[2] He urged his father-in-law to create such a trust for his children; his advice was followed and a trust was created in favor of his children. For some reason, the trust was broken and all of the father-in-law's estate, except that which was inherited by Dr. MacFarlan's wife, was dissipated. Moved by this forcible vindication of his views and evidently feeling that his own children inherited spendthrift blood, he had his children convey to him their interest in their mother's estate, whereupon he created a trust, which is still effective, giving the whole estate to his children. A son testified as to these incidents:

"Q. Did he" (Dr. MacFarlan's father-in-law) "leave a large estate? A. He had left a half a million dollars, one hundred thousand dollars of which accrued to my mother.

"Q. You say that estate had been dissipated? A. The rest of the members of the family, my uncles and aunts, had largely dissipated their fortune. There was that example before us.

"Q. That was discussed? A. And that was the gist of all our conversations about these trust matters, grandfather's money, my mother's father's money, had been dissipated, because the deed of trust that had been formed had been broken.

"Q. There had been a deed of trust? A. There had been a deed of trust formed, and at my father's suggestion at that time, in the nineties.

"Q. I see. A. In 1913 we children distinctly—it was not to, in my opinion, so much for my father to give over his right in my mother's estate, because he had plenty of money of his own, in his own right, he had much more at that time than she ever had by her inheritance, it wasn't for the sake of handing his right over to the children, but it was for the sake of protecting the children against themselves and holding intact the principal of her estate, and that is why we formed a trust in 1913. It was the very motive that prompted him to conserve the estate in 1920."

2 It is interesting to note that King Solomon was obsessed with the same idea and was the father of modern trusts. See Proverbs, 13 Chapt., 22 Verse, where he says: "A good man leaveth an inheritance to his children's children."

It will be noted that the making of this trust was solely for the benefit of the children and that Dr. MacFarlan gave up all spouse rights in his wife's estate. This incident evidently left a deep conviction and determination on Dr. MacFarlan's mind of the desirability of trusts in favor of his children. It was frequently referred to by him. A son testified:

"Q. Well, did you talk about your grandfather's estate? A. Yes.

"Q. All right, now, what did you say about that, or he say? A! The nature of the conversation was always of this type, we regretted that a deed of trust had not been carried out in my grandfather's estate, as had been contemplated and planned, and that that estate had been dissipated by other members of the family than my own mother, who represented one interest. That was really the background of making the estate in 1913 out of her estate—making the trust out of her estate."

"By Mr. Frick:

"Q. Making the trust out of her estate? A. Making the trust out of her estate, that was the background of that, many times we spoke about trusts, long before the trust was made."

While his son was overseas in the Army, the father wrote him about the trust. He further testified that on his return "he spoke to me about the advisability of having a deed of trust, because on account of my grandfather's will being dissipated, he did not want his money to go the same way." Another son testified that when he was overseas his father wrote him about making a trust, and when he came home, he told him "he was going to put his property in a trust for the protection of his children." Dr. MacFarlan's reason for not immediately making the trust was proven by a son, as follows:

"Q. Why wasn't it done earlier, if you had been talking about it for so long? A. He didn't do it during the war because he wanted to get—wanted—as he wrote to me, he wanted to wait until I came back, he had more or less trained me to take his place when he went, and when I was at the war he wrote me and sent me a plan of—or an idea as to what he had in mind in making—in dividing up his estate, in making, at least, in making this trust. I wrote him rather fully, it is covered in one of those letters, telling him not to wait, go ahead."

Following out his long time convictions, Dr. MacFarlan had his lawyer draw the deed of trust dated February 9, 1920. The latter's testimony shows it was the result of a well thought out problem by the donor for the rest of his life.

"The Witness: Well, I will put it this way, then, Dr. Macfarlan had told me that the securities that he proposed to put in this trust represented either a very substantial part or practically his entire estate. I had gotten to know Dr. Macfarlan pretty well by that time. There had sprung up between us the intimacy that sometimes does spring up between an elderly gentleman and a younger man, and I knew him well enough to talk to him pretty frankly, and I said to him, in substance, 'Dr. Macfarlan, I question the wisdom of doing this thing,' and he asked me why, and I said, 'The time may come when you will need the income that these securities represent. You may live to be a great many years—you may live for a great many years, and as I see it, you are putting yourself in a position where you may be dependent upon your children for your support,' and his answer was that, 'I have considered that, and that does not trouble me. I still have my health, I am still able to earn a living,' he was at that time in active practice of medicine, and he said, 'My wants are very simple, I live with my daughter', and I think he told me with one of his sons, 'and my expenses are not very heavy.'

"I said, 'However, you are even giving away the house that you live in and while I don't mean to intimate that it will be the case with your children, I have seen it happen before that children lose all sense of gratitude, and it is quite possible that you might some day find yourself in a position where you would be dependent upon your children for help, and they would not be disposed to help you.'

"His answer to that was, 'Well, if worst comes to the worst, I could always go'—I think he said to the Naval Home, he may have said some other home, but at any rate, by reason of the fact that he was a Civil War veteran he conveyed to me the impression that as a last resort if he was in need of the bare neces-

sities of life that he had that refuge to fall back upon."

Having thus made provision for his life, Dr. MacFarlan, in his methodical way, made his will the same day, in which as to his after-acquired estate he made the same trust provisions for his children. He was a man of robust health, never had any sickness, thereafter and until his last illness continued in active practice of his profession, made semiweekly visits superintending his farms twenty odd miles distant. In the year following the making of the deed of trust, his accounts, kept by himself, show he averaged a hundred calls on patients in addition to his office practice and his income was in excess of $400 per month. He died one year and ten months after he made the deed of trust. He had no sickness then. As testified by a physician, "He gradually wore out, as we all do, as we all do, but I think he came to a certain hurdle in his life and he just failed to make it." He was then seventy-eight years of age, but as said in the Wells Case, supra, "Age in itself cannot be regarded as furnishing a decisive test, for sound health [which Dr. MacFarlan had] and purposes associated with [his] life, rather than with [his] death"—the purpose to conserve his estate to his children, which was Dr. MacFarlan's dominant aim—"may motivate the transfer." Applying the principles of that case to Dr. MacFarlan, his deed of trust was made in contemplation, not of death, but of life. So holding, the judgment for defendant is reversed and the case remanded with directions to enter a judgment with interest for the plaintiffs' claim.